**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SHIRLEY DORSHIMER and ROBERT DORSHIMER** | : |
| | : |
| **Plaintiffs** | :    **CIVIL ACTION NO. 3:13-0553** |
| | : |
| **v** | : |
| | :    **(JUDGE MANNION)** |
| **ZONAR SYSTEMS, INC., and VELOCITI, INC.** | : |
| | : |
| **Defendants** | : |

## <u>MEMORANDUM</u>

Presently before the court in this products liability action is the motion for summary judgment filed by defendant Zonar Systems, Inc. ("Zonar") on plaintiffs' claims for strict liability and negligence. (Doc. 33). For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

This is a strict liability and negligence action arising from an incident in which plaintiff Shirley Dorshimer was injured at work on August 30, 2010. Plaintiff was employed as a school bus driver for First Student, Inc. when she fell from the step of her bus. Plaintiff alleges that a handheld device manufactured by Zonar used to conduct pre-trip and post-trip vehicle inspections by bus drivers had been mounted in her bus in a location above the windshield and over the steps in such a manner that she was placed in an awkward and unstable position while reaching for it. As a result, plaintiff fell

down the steps of the bus while reaching for the handheld device and suffered injuries, including a concussion and an injury to her right wrist.

Plaintiff and her husband, Robert Dorshimer, commenced this action in the Court of Common Pleas of Monroe County, Pennsylvania and filed a complaint against Zonar on January 28, 2013. (Doc. 33-1). Plaintiffs' complaint contains three counts, strict liability, negligence and loss of consortium for Mr. Dorshimer. In their strict liability claim, plaintiffs allege that Zonar as the designer, manufacturer and seller of the device provided a defective product. First, plaintiff alleges that the product's design called for it to be placed in the stated location of the bus. Secondly, plaintiff alleges that Zonar failed to warn and instruct users as to the dangers of placing its product in the stated location. Specifically, plaintiff alleges that the design called for the placement of the device over the entrance of the bus against the front panel (i.e., bulkhead) above the windshield when safer alternatives were available and, that the product lacked adequate safety features or warnings. These defects allegedly resulted in improper installation of the device in a dangerous location on the bus which caused plaintiff's fall. With respect to their negligence claim, plaintiffs allege that Zonar failed to exercise reasonable care in the design, manufacture and sale of the product. Plaintiff also alleges that Zonar assumed and negligently performed a post-sale duty to warn about the placement of the device over the entrance of buses.

On February 26, 2013, Zonar filed an answer to plaintiffs' complaint with

new matter. Zonar denied all liability and denied that the product design called for its placement over the entrance of a bus. Zonar also alleged that it was not responsible for selecting the location where its device was installed. In its new matter, Zonar alleged that Mrs. Dorshimer was comparatively negligent and that she assumed the risk since she knew where the Zonar inspection unit was located and since she situated herself in such a position when reaching for the unit that she knew, or in the exercise of reasonable care, should have known, was dangerous. (Doc. 33-2).

Zonar joined third party defendant, Velociti, Inc. ("Velociti"), as an additional defendant by filing a Writ in the Monroe County action on February 21, 2013. Velociti was the professional installation company hired by plaintiff's employer First Student to install the Zonar device on plaintiff's bus. On February 27, 2013, Zonar filed a notice of removal of this case to federal court. (Doc. 1). On April 29, 2013, Zonar filed a third party complaint against Velociti. (Doc. 8). Zonar alleges that Velociti was negligent in the placement of the device on plaintiff's bus. Velociti answered Zonar's third party complaint on May 14, 2013. (Doc. 11). Velociti admitted that it had contracted with plaintiff's employer to install the Zonar device into First Student buses in accordance with installation instructions provided by Zonar. Zonar claims that the installation instructions which came with its product provided that the Handheld Vehicle Mount should not be affixed above the entryway of a school bus, and that both First Student and Velociti were aware of these installation

3

instructions.

After discovery was completed, Zonar filed its summary judgment motion, pursuant to Fed.R.Civ.P. 56, on August 28, 2015. (Doc. 33). Zonar simultaneously filed its statement of material facts with attached exhibits. (Doc. 34). On September 11, 2015, Zonar filed a supplemental exhibit, namely, a copy of the June 11, 2015 Report of plaintiffs' expert engineer Harold A. Schwartz, P.E., along with his Curriculum Vitae. (Doc. 35). Also, on September 11, 2015, Zonar filed a brief in support of its motion. (Doc. 36). On October 19, 2015, plaintiffs filed their response to Zonar's statement of material facts and their brief in opposition to Zonar's motion with two exhibits attached. (Doc. 39, Doc. 40). Zonar filed its reply brief on October 28, 2015. (Doc. 41).

Since third party defendant Velociti did not timely file a brief in opposition to Zonar's summary judgment motion, it is deemed as not opposing the motion under Local Rule 7.6, M.D.Pa.

## II.   MATERIAL FACTS[1]

Since 2008, First Student contracted with the Pleasant Valley School District ("PVSD") in Brodheadsville, Pennsylvania to provide fleet transportation services for PVSD's students. Under this arrangement, First

---

[1]The facts are derived from Zonar's statement of material facts and the plaintiff's response to it as well as the exhibits.

4

Student owns, operates and maintains a fleet of school buses on site and directly employs the bus drivers. Plaintiff Shirley Dorshimer was employed by First Student as a school bus driver at the PVSD. School bus drivers are required by First Student to conduct prescribed pre-trip and post-trip inspections of their buses on a daily basis.

Zonar designed, manufactured and sold a product known as an EVIR HD-GPS System which included an electronic handheld device known as an EVIR ("handheld") with which a driver can conduct and record pre-trip and post-trip inspections of vehicles, including school buses. The purpose of the system is to provide Zonar's customers with a device used for safety compliance. When not in use, the handheld is stored in a Vehicle Mount which is affixed inside the vehicle. The Vehicle Mount serves as a charging station for the handheld and is connected by electrical cable to a part of the system known as a GPS Unit. The GPS component of the system provides the location of the vehicle while it is in operation. Data collected by the handheld unit is downloaded through the Vehicle Mount to a computer in the GPS Unit. Subsequently, the data is transmitted electronically to a remote Zonar receiving station. The GPS system allows a school district to do away with the paper form of a pre-trip inspection and a post-trip inspection report. (Doc. 34-3). The GPS and EVIR systems are separate and distinct. In the bus at issue in this case, both systems were installed.

The design of the Zonar system calls for the GPS Vehicle Mount to be

physically mounted on the inside of the vehicle. The design also calls for a school bus driver to access the handheld from the Vehicle Mount on four occasions, twice when doing the pre-trip inspection, i.e., removing and then replacing, and twice when doing the post-trip inspection. Once it was used for the inspection, the handheld had to be placed back into the GPS Vehicle Mount for the user interface with the Zonar servers. The servers then receive information from the reader that document the pre-trip and post-trip inspections. The system requires two antennas. The one antenna is the GPS antenna. The second is the GSM antenna which is a cellular antenna that allows the GPS data and the EVIR data to be off-loaded from the bus onto cellular towers for subsequent travel to Zonar servers. The GPS Unit is remotely connected by wires to two antennas mounted on the exterior of the vehicle for receiving and transmitting purposes. The handheld Vehicle Mount is not directly connected to the antennas, rather it is connected to the GPS unit and the GPS unit is connected to the antennas.

In order to perform a vehicle inspection, the driver must remove the handheld from the Vehicle Mount and then walk to various locations in and around the perimeter of the vehicle where "vehicle tags" have been affixed as part of the Zonar's system. A vehicle tag is a small disk which can be read electronically by the handheld. As the driver proceeds through the inspection, the handheld will record that the driver went to the location of each vehicle tag on the vehicle, documenting that an inspection has occurred. This data is then

6

made available by Zonar to First Student for its internal use.

In 2007, Velociti had installed Zonar systems in 6,000 or 7,000 school buses for First Student in Massachusetts. First Student was initially introduced to Velociti for the 2007 installation project by Zonar. In 2007, Velociti's technicians did the installations of Zonar systems on First Students' buses assisted by representatives of Zonar. Zonar paid Velociti for the installation services in 2007. Velociti's technicians received training on how to install the Zonar GPS systems as part of the 2007 project from Zonar personnel, including the placement of hardware on the buses and details of the installation.

In July of 2008, First Student entered into a new agreement with Velociti to have it install additional Zonar systems in First Student buses at several other locations, including Brodheadsville. Karen DeNardo, the Location Manager for First Student at the PVSD location, stated that in 2008, First Student acquired the transportation unit of PVSD and contracted with PVSD to provide the bus service for its students. After the acquisition, First Student hired some of the employees of PVSD, including DeNardo and bus drivers such as plaintiff, who had worked in the transportation unit. DeNardo testified that she was told by somebody from Zonar that Velociti was going to be the installer for the Pleasant Valley project and she was contacted by someone from Zonar and Velociti about scheduling dates for the installation of the systems on the 123 buses at PVSD. DeNardo was not aware if anyone from

Zonar actually came to PVSD during the installation. (Doc. 40-1).

The agreement between First Student and Velociti was contained in a in a July 31, 2008 document titled "First Student Zonar Project." The agreement between First Student and Velociti provided, in part, the following: a dedicated 2-person Project Management team; Velociti will provide a Project Manager and Data Manager who will function as the primary points of contact and have responsibility for all Velociti activities; the Project Manager and Data Manager will work with a specified First Student contact to ensure that all conditions are met and accomplished to First Student's reasonable satisfaction; and a team that will work proactively with First Student to analyze bus access data. Under the 2008 agreement, Velociti also provided a 90-day warranty on workmanship. Further, the 2008 agreement provided that Velociti was to be paid $138 per installation of the Zonar systems on First Student's buses. There was no reference or requirement in the document for Zonar to inspect any of Velociti's work for First Student. (Doc. 34-6).

First Student paid Velociti directly in 2008 for the installation of the Zonar systems on its buses. The Zonar systems, which included both the GPS and EVIR systems, were installed by Velociti as part of the 2008 project on the First Student bus driven by plaintiff. Velociti followed the exact same installation methodology in 2008 as it did for the 2007 project. Zonar had a contact person for the 2008 installation project involving Velociti and First Student.

Velociti and First Group of America ("FGA"), the parent company of First Student, prepared another document in 2008 titled "First Student Quality Assurance Statement of Work." (Doc. 34-13). Zonar participated in the preparation of this document between Velociti and First Student, and Zonar dictated the provisions about the fuses, the holes being drilled, and the size of the grommet for the installation of its systems. The document also provided under "Responsibilities of Velociti" that "It is agreed by all parties that Exhibits A and B provide compliance to Zonar's Pro Installers Guide revision dated 12/19/07." As such, Velociti had Zonar's Installation Guide, which was revised in December of 2007, when it performed the 2008 project for First Student at PVSD. In particular, Zonar's Installation Guide referenced the vehicle mount with its GPS device and the handheld portion of the GPS device.

Velociti's Vice President and General Manager Tim Kats stated that the "First Student Schedule" had a listing of all of the sites, the dates, and the quantity of buses Velociti was to install the Zonar systems for First Student. Kats stated that the schedule was for Velociti to go back out to the sites after the installations to perform the responsibilities spelled out in the Statement of Work. He also stated that the schedule was for the quality assurance visits and not the 2007 or 2008 installations. Kats admitted that the "First Student Quality Assurance Statement of Work" document referenced the responsibility of Zonar to provide quality assurance checks on the 2007 installations of its systems by Velociti on First Student's buses and did not encompass the 2008

9

installations. However, Kats further stated that Velociti was going to follow Zonar's guidelines for installation of its systems going forward, including the 2008 installations. (Doc. 34-6).

Zonar also provided Velociti with a document titled "Equipment Installation Manual" in 2007 prior to the initial installations of the Zonar systems Velociti performed for First Student. Each of Velociti's installers would receive a copy of this manual and the manual was readily available to Velociti's project and account managers. Page four of the manual was entitled "General Guidelines" and under the "Layout" section it indicates that for installation of the Zonar systems you should avoid mounting equipment, both the GPS vehicle mount and the handheld, in difficult to access areas. For the 2008 installation project at PVSD, Velociti was aware that the Zonar systems it was installing in the First Student buses were to be used by the First Student school bus drivers and that the systems should not be mounted in an area that would be difficult to access by a bus driver. The Guidelines for Layout also stated that the systems should not be mounted in dirty, dusty or damp areas, such as near floors or entranceways.

Before the 2008 installation project at PVSD, Zonar shipped the Zonar systems directly to First Student at the Brodheadsville location in late October. Zonar collaborated with First Student and Velociti to accommodate Velociti's installation schedule and to make sure that the Zonar systems were shipped and available on site for the scheduled installation. Zonar also

10

scheduled training for the bus drivers by its personnel after the installation was completed. Occasionally, if Zonar detected that an installed unit was not functioning properly or a customer reported a possible installation issue and requested Zonar to verify that there was an issue, Zonar would target that vehicle for troubleshooting by its employees.

Velociti installed the Zonar systems and its Vehicle Mount in the bus plaintiff was driving on the day of her accident (number 42) in the bulkhead of the bus on the passenger side which was identified as the area above the driver's head and windshield in the front of the bus and over the entry steps to the bus. Kats testified that the Vehicle Mount on plaintiff's bus was installed in accordance with Zonar's installation manual as well as the guidelines Velociti received from First Student, namely, First Student Quality Assurance Statement of Work. Kats stated that First Student's guidelines, which Velociti received before the 2008 project,  required that the system had to be mounted on the bulkhead of the bus and that Velociti was not to move the first aid kit or the body fluid cleanup kit. Also, Velociti could not cover up any placards. Nor could the system be installed on the glove box in the bulkhead. (Doc. 34-6).

Additionally, the July 2008 agreement between First Student and Velociti provided that Velociti had to install the Zonar Systems "in accordance with the Installation Recommendations of First Mobile Technologies", a professional installation company that is a subsidiary of First Group, the

11

parent company of First Student. The Recommendations for installation of vehicle mounts for the make of bus plaintiff operated provided, in part, that the handheld unit should be mounted on the bulkhead between the first aid kits and it permitted moving the first aid kits to allow the equipment to be mounted.

Andre Horochiwsky, Zonar technical and training manager, was aware that First Student utilized Velociti to install the Zonar systems on its buses at PVSD in 2008. In January 2007, Horochiwsky was also on site in Massachusetts when First Student initially used Velociti to install Zonar systems on its buses. For the 2007 project, Velociti was referred to First Student by Zonar as a company to do installation of the systems. Velociti personnel received training from Zonar regarding the installation of its systems. The training by Zonar occurred before any major installation job by an installer, such as Velociti. Horochiwsky stated that the Zonar equipment was very specific and it had unique requirements regarding installation. The training Zonar would provide to Velociti pertained to the specific requirements of the systems, such as electrical and antenna requirements, and the general nature of how to install the systems. The training did not teach Velociti's staff things like how to strip a wire, clean the surface of the bus before attaching a tag or where to install a piece of equipment since Velociti was a professional mobile installer company and it was presumed its staff had a certain amount of knowledge about installing mobile devices.

Zonar's Equipment Installation Manual was distributed to the installation companies, including Velociti, to provide general guidelines for the installation of its systems in a variety of vehicle, such as tractor trailers, bulldozers and buses. Also, the Zonar Systems Hardware Installation Tips were provided to Velociti. One of the Specific Guidelines in the Manual stated "Avoid mounting equipment in difficult to access areas" for the vehicle operators. Horochiwsky stated that he would consider a Zonar Vehicle Mount installed above the stairs of a school bus to be a difficult access area and in violation of the specific guidelines of the Zonar Systems Hardware Installation Tips. The First Student Quality Assurance Statement of Work provided that Zonar would conduct a Quality Assurance check after Velociti's installation to ensure that the handheld device of the system on each bus could be inserted and removed from the Vehicle Mount. During this check, Zonar technicians would see where the Vehicle Mount was installed within the vehicle. Horochiwsky stated that he assisted in the preparation of the Zonar documents discussed above. (Doc. 34-3).

The Zonar systems were installed in the buses at the Brodheadsville location by Velociti technicians Jacob Judd and Brandon Anderson. Prior to the installation job at PVSD, Judd and Anderson received general training on how to install Zonar systems on school buses at another location as part of a pilot project. The training was a group effort and had representatives from Zonar, including Lonnie Flint, First Student and Velociti, including Project

Manager Jeremy Webb. During the training, Velociti's technicians installed the Zonar systems on the buses and anything done that was not acceptable, was changed. The representatives from Zonar and First Student told Velociti's technicians where the equipment could and could not be placed. Judd was informed by Velociti at the training, prior to the 2008 installations, that the prime location for the Zonar handheld was in available area of the bulkhead to the left of the bus driver's rear view mirror because it was farthest away from the stairs. The Velociti technicians were also in possession of and familiar with the guidelines of the Zonar Equipment Installation Manual. Judd acknowledged that the installation of the system over the steps in bus number 42 was in violation of Zonar's installation instructions since it was placed in an area that was difficult for bus drivers to access, was mounted next to an entranceway and was located in a potentially, dirty, dusty or damp area. Judd indicated that he asked First Student's shop mechanic regarding the placement of the Zonar system, but the mechanic did not know the product well. However, Judd stated that he decided the area to install the Zonar system in bus number 42 due to the restrictions contained in First Student's guidelines which required that the system had to be mounted on the bulkhead of the bus and not covering any signs or moving the first aid kit located on the bulkhead. As such, Judd stated that since the bulkhead area already had pre-existing signs, devices and kits, he installed the Zonar Vehicle Mount on the bulkhead of bus number 42 over the steps as it was the only available

space. Judd also testified that when he was confronted with the situation when there was no open space available on a bus bulkhead except over the steps to put the Zonar Vehicle Mount he was concerned so he took a photograph and emailed it to his superior at Velociti, Project Manager Webb, for approval to place it over the steps. Judd received approval from Webb and then installed the Zonar Vehicle Mount in the stated location.

During the 2008 installation process at PVSD, Judd indicated that Jacob Gabbard, an employee of Zonar, was on site for a couple of days and he performed quality control checks on the installation of the Zonar systems by Velociti's employees on First Student's buses. Judd stated that Gabbard made sure "the light sequences were proper, placement was proper, proper grommets in the proper spot, loom where it needed to be loomed, proper antenna placement, [and] everything [else] that pertain[ed] to the installation of the Zonar." Also, Lonnie Flint, the Zonar account manager who handled the First Student account, was on site at PVSD during the installation process. Judd stated that after he and the other Velociti technician would install the Zonar systems on a bus, Gabbard would go back in the bus behind them and check their work. Judd did not ask Gabbard permission to place the handheld over the step well in bus number 42 and he stated that placement of the handheld over the step well is not the preferred location. However, he had no other space available on the bulkhead in bus number 42. Further, Judd did not recall receiving any comments of any kind from the site manager or shop

15

mechanic about the quality of his work before he left the PVSD site. (Doc. 34-12).

Flint testified that at some point he was informed by either First Student or Velociti that Velociti was facing challenges placing Zonar Vehicle Mounts on some model buses because of the lack of space on the bulkhead. He referred them to the Zonar Equipment Installation Manual to find a solution consistent with its Guidelines. Flint does not know whether this conversation took place before the PVSD installation and he was not told that Velociti installed any Vehicle Mounts over the steps of First Student's buses. Flint also stated that Zonar did not prohibit movement of existing equipment on bus bulkheads to allow the placement of vehicle mounts. (Doc. 34-7).

Zonar contends that its evidence, including a November 8, 2008 email from Gabbard, disputes Judd's testimony that Gabbard was on the PVSD site when Judd was there during the installation of the systems to conduct quality assurance work. Nonetheless, Gabbard admitted that he was on site at PVSD in 2008. (Doc. 34-15). Gabbard acknowledged that he met Judd but does not recall when and where, and stated that it was only one occasion. However, Gabbard stated that he did not recall any Velociti personnel at PVSD when he was there. Also, Gabbard stated that he went onto only one or two buses at PVSD and did not see the Zonar handheld positioned over the steps on those buses.

Eric Kloss was the senior director of Operational Support for First

16

Student since 2007. The first large scale installation of Zonar equipment on First Student buses began in 2007. Kloss' unit facilitated the installation operations for First Student. First Student's safety department helped to determine the safe places to locate the Zonar handheld devices on its buses and approved the placement of the Vehicle Mounts (a/k/a, cradle) to hold the handheld devices. First Student's safety department worked directly with either Zonar or Velociti "in terms of what is safe placement for a cradle." Kloss also stated that since First Student had many different makes and models of buses, different locations of the Zonar system had to be determined on different types of buses and, the general installation guidelines were reviewed in terms of choosing a spot where the bus driver could get the handheld safely in and out of the cradle. Another consideration in selection of appropriate locations for the handheld unit was avoiding the bus stairwell. In 2008, Kloss was aware that placing the handheld unit on the bulkhead of the bus over a stairwell constituted a difficult to access area and a driver might have to stretch to get their hands on it. He further knew that placement over stairwells could result in safety concerns. Also, as of 2008, Kloss was aware of the Zonar Installation Manual Guideline which stated to "avoid mounting equipment in difficult to access areas." (Doc. 34-1).

Zonar also submitted as a supplement to its statement of material facts the June 2015 report of plaintiffs' engineer expert, Schwartz. (Doc. 35-2). Schwartz opines that the placement of the Vehicle Mount holding the Zonar

handheld was unsafe for use. He opines that Zonar is responsible for the accident at issue due to the unsafe mounting location of the handheld charging device despite the fact that Zonar did not install the systems since it was responsible to ensure that the systems were properly installed by Velociti under the guidelines provided by Zonar. He also states that Velociti is responsible for the accident because it installed the handheld charging unit in "an inappropriate and unsafe location" above the entry stairs and adjacent to the passenger door that opened to the outside. He opines that "In this location the device was not only subject to dampness for the opening door but access to the handheld device was dangerous and violated the Zonar Vehicle Mount Placement Guidelines." Quite simply, Schwartz states that the location of the Vehicle Mount for the handheld device was not easily and safely accessed by the bus drivers, especially for plaintiff who was five feet two inches tall, who were required to access the device four or six times a day for bus inspections.

Zonar points out that Schwartz does not contend that the Zonar product was inherently dangerous, only that the placement of the Vehicle Mount was unsafe for use. Zonar also indicates that Schwartz does not contend the Zonar installation manual was at fault and, that he does not contend the manual's instructions regarding the placement of the Vehicle Mount were inadequate. Nor does he suggest that any alternative warnings or instructions should have accompanied the product or that any such warnings would have

prevented plaintiff's accident. Further, he does not contend that there was anything about the design of the product that "called for" the installation of the Vehicle Mount where it was situated in plaintiff's bus.

## III.   STANDARD OF REVIEW

Zonar's motion for summary judgment is brought pursuant to the provisions of Fed.R.Civ.P. 56. Zonar argues that under Rule 56, the undisputed material facts demonstrate that it is entitled to summary judgment with respect to all of the counts of plaintiffs' complaint.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson,

477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).The nonmoving party "may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact." Big Apple BMW, 974 F.2d at 1363. However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof

at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

Additionally, a "party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT & T, 161 F.Supp.2d 323, 327 (D.N.J. 2001) (citing Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548).

## IV.    DISCUSSION

Zonar contends that it is entitled to summary judgment with respect to plaintiff's claims for strict liability and negligence. Mr. Dorshimer's loss of consortium claim can not proceed without the two underlying claims of his wife since it is contingent upon them. Zonar also claims that Velociti negligently installed its system on the bus plaintiff was driving on the day of her accident.

### 1. Strict Liability Claim

Plaintiff's strict liability claim is premised on both a design defect theory and a failure to warn theory. (Doc. 1-2, at 5-7, Doc. 7). Plaintiff alleges that the design of the Zonar product called for the placement of the handheld inspection unit over the entrance of the bus when safer alternatives were

21

available and, that the product lacked adequate safety features or warnings. These defects allegedly resulted in improper installation of the device in a dangerous location on the bus which caused plaintiff's fall. Zonar argues that summary judgment is appropriate as to plaintiff's strict liability claim since plaintiff has failed to produce prima facie evidence that Zonar's product was defective or that it caused plaintiff's harm. Zonar also contends that it gave adequate warnings with its product.

Plaintiff is proceeding, in part, on a theory of strict product liability under the recent Pennsylvania Supreme Court decision in Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), against Zonar.[2] Since the Pennsylvania Supreme Court in *Tincher* declined to adopt Third Restatement of Torts in the context of design defect cases, plaintiff is proceeding on her design defect strict liability claim pursuant to Section 402A of the Second Restatement of Torts.[3] Also, "the Pennsylvania Supreme Court just recently clarified in Tincher v. Omega Flex, Inc. that, under Pennsylvania law, Section 402A

_____

[2]Jurisdiction of this court is based on diversity pursuant to 28 U.S.C. §1332(a). As such, the substantive law of Pennsylvania law is utilized. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938); see also Guaranty Trust Co. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464 (1945).

[3]In Tincher, 104 A.3d at 399, the PA. Supreme Court overruled Azzarello v. Black Brothers Co., Inc., 480 Pa. 547, 391 A.2d 1020 (Pa. 1978), but "declined the invitation to fill the void by simply 'adopting' the Third Restatement [of Torts] formulation" with respect to "the appropriate standard of proof of a [design defect] strict liability claim in Pennsylvania." Thus, "Pennsylvania remains a Second Restatement jurisdiction" in design cases and a strict liability cause of action sounds in tort. Id. at 399-400.

governs only strict liability claims, and that common law negligence claims are subject to a different standard and analysis. Schwartz v. Abex Corp., --- F.Supp.3d ----, 2015 WL 3387824, *5 (E.D.Pa. May 27, 2015) (citing Tincher, 104 A.3d at 336, 345, 358, 381-83, 384).

In a strict products liability action, the plaintiff must prove that: (1) the product was in a defective condition; (2) the defective condition proximately caused her injury; and (3) the defective condition existed at the time the product left the defendant's control. Walton v. Avco Corp., 530 Pa. 568, 610 A.2d 454, 458 (1992); Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 53-54 (3d Cir. 2009). All of these elements must be proven by the plaintiff by a preponderance of the evidence. A product is defective when it is unsafe for its intended use.

To demonstrate a breach of duty in a strict liability matter, the plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a "defective condition." Tincher, 104 A.3d at 384. A product is defective "when it is not safe for its intended use." Weiner v. American Honda Motor Co., Inc., 718 A.2d 305, 308 (Pa.Super. 1998). Three types of defective conditions that can give rise to a products liability claim are design defect, defect in manufacturing and defect due to inadequate or lack of warnings. See Habecker v. Clark Equip. Co., 36 F.3d 278, 283 (3d Cir. 1994).

A person or entity engaged in the business of selling a product has a duty to make and/or market the product—which "is expected to and does

23

reach the user or consumer without substantial change in the condition in which it is sold"—free from "a defective condition unreasonably dangerous to the consumer or [the consumer's] property." Tincher, 104 A.3d at 383; Restatement (2d) of Torts §402A(1). "Section 402A makes sellers liable for harm caused to consumers by unreasonably dangerous products, even if the seller exercised reasonable care[.]" Covell v. Bell Sports, Inc., 651 F.3d 357, 360 (3d Cir. 2011).

The legal issues in this case are: 1) was the Zonar system with the handheld device defectively designed and unsafe; and 2) did the Zonar system have inadequate warnings regarding where to place the product's Vehicle Mount. In Tincher, 104 A.3d at 383, the court stated that the non-delegable duty in a strict liability case is "a person or entity engaged in the business of selling a product has a duty to make and/or market the product—which 'is expected to and does reach the user or consumer without substantial change in the condition in which it is sold'—free from 'a defective condition unreasonably dangerous to the consumer or [the consumer's] property.'" (citing Restatement (2D) of Torts §402A(1)). "To demonstrate a breach of duty in a strict liability matter, a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" Tincher, 104 A.3d at 384. Additionally, "in Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product." Id. at

401. The alternative test standard of proof is a "composite", i.e., a standard of proof which states the consumer expectations test and the risk-utility test in the alternative. Id. at 402. "[T]he strict liability cause of action theoretically permits compensation where harm results from risks that are known or foreseeable ... and also where harm results from risks unknowable at the time of manufacture or sale ...." Id. at 404-05.

Plaintiff may prove that the Zonar product is in a defective condition by showing either that: (1) the danger is unknowable and unacceptable to the average or ordinary consumer (i.e., the consumer expectations test); or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions (i.e., the risk-utility test).

Plaintiff alleges that the Zonar system was defectively designed. In determining whether a product had a design defect, the question is whether the product should have been designed more safely. Spino v. John S. Tilley Ladder Company, 696 A.2d 1169, 1172 (Pa. 1997). "A product is deemed defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be not 'reasonably safe.'" Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 55 (3d Cir. 2009) (citing Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000, 1019 (2003)).

In the present case, plaintiff did not present evidence to show that the

25

Zonar product was dangerous for use in and of itself. There is no dispute that plaintiff was not injured by the Zonar product. To the contrary, plaintiff's accident was allegedly caused as a result of her being forced to reach in an awkward and unstable manner for the Zonar handheld device mounted on the bulkhead of the bus over an open stairwell to use it. Indeed, plaintiff's engineering expert, Schwartz, does not opine that there was anything dangerous about the design or function of the Zonar system which caused plaintiff's injury. Nor does Schwartz contend that the Zonar product was inherently dangerous or not reasonably safe. Further, he does not contend that there was anything about the design of the product that required the installation of the Vehicle Mount where it was situated in plaintiff's bus. Rather, he opines that the placement of the Vehicle Mount over the stairwell in plaintiff's bus was unsafe for use. He contends that Zonar should have ensured that Velociti followed Zonar's installation instructions in placing the Vehicle Mount in an appropriate location in plaintiff's bus. Additionally, Schwartz does not suggest a reasonable alternate design for the Zonar product.

Plaintiff's design defect claim fails since there is no evidence showing that the Zonar inspection unit with its handheld device and its Vehicle Mount were "not reasonably safe." In fact, in their brief in opposition to Zonar's summary judgment motion, plaintiff appears to abandon her strict liability design defect claim. (Doc. 40, at 9). Regardless, there is no evidence in the

record that the Zonar product was not reasonably safe with its current design. Nor is there any evidence that there was anything dangerous about the design of Zonar's product, its handheld device, and its Vehicle Mount. Also, as Zonar states, the design of its unit did not require placement over the entrance of the bus. Further, plaintiff does not offer any evidence to show that the design of Zonar's product caused her injuries. Absent such evidence, plaintiff's design defect claim cannot withstand Zonar's summary judgment motion. Thus, Zonar's motion for summary judgment with respect to plaintiff's strict liability design defect claim is **GRANTED**.

In addition to challenging the design of the Zonar product, plaintiff claims that her accident was caused by a defect due to inadequate warnings. Plaintiff alleges that Zonar's product had insufficient instructions as to where the unit was to be placed in the bus and that this posed potential safety hazards which were substantial factors in causing her harm. As such, the issue regarding this aspect of plaintiff's strict liability claim is whether Zonar adequately warned at the time of sale of its product against placement of the Vehicle Mount in the stated location in the bulkhead, i.e., the front panel above the windshield and over the stairwell of bus number 42. This issue focuses on whether plaintiff's accident resulted from a defective warning by Zonar regarding where to place the Vehicle Mount or whether her accident resulted from improper installation of the Vehicle Mount by Velociti.

A product that is properly designed may still be unreasonably

dangerous, i.e., defective, for strict liability purposes if the product is sold without sufficient warnings to apprise the ultimate user of the latent dangers of the product. Pavlik v. Lane Ltd./Tobacco Exporters Int'l, 135 F.3d. 876, 881 (3rd Cir. 1998) (citing Davis v. Berwind Corp., 547 Pa. 260, 690 A.2d 186, 190 (1997)). In a failure to warn case, to show that the defect was a proximate cause of the plaintiff's injuries, "the plaintiff must establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries." Id. (citations omitted). "While the question of causation in Pennsylvania is normally for the jury, 'if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law.'" Id. (citing Conti v. Ford Motor Co., 743 F.2d 195, 197–98 (3d Cir. 1984)).

To establish a failure to warn theory, a plaintiff must show that a warning was either absent or inadequate and that the user would have avoided the risk had she been advised of it by the seller. Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1171 (Pa. 1995). "[T]he adequacy of the warning is evaluated solely on the basis of whether the warning was inadequate and a better warning would have prevented the injury." Blake v. Greyhound Lines, Inc., 448 F.Supp.2d 635, 642 (E.D.Pa. 2006) (citing Phillips, 665 A.2d at 1171).

Plaintiff contends that her evidence shows the warnings Zonar provided with its product were inadequate and that a better warning would have been

28

more effective. Plaintiff argues that Zonar offered no warnings to her or to First Student regarding the placement of the handheld device in bus number 42. Plaintiff points out that while Zonar undisputedly provided warnings, such as to avoid mounting equipment in difficult to access areas, to the installer of its product on the buses at PVSD, namely, Velociti, it failed to provide those warnings to either First Student or her. Plaintiff maintains that she has produced evidence to show that Zonar's failure to warn lead to her accident. Plaintiff states, (Doc. 40, at 11), that Schwartz's Report indicates that Zonar's failure to warn created two problems:

> First, a person attempting to reach the hand-held portion of the GPS unit would be on a step of narrow width reaching upward causing an unsafe and dangerous condition. Second, a person of short stature, including Mrs. Dorshimer, at 5 feet 2 inches tall, would have to reach and stretch to retrieve the hand-held from the vehicle mount while either on the narrow step or if on the bus floor, she would be force to reach outward, creating another unsafe and dangerous condition.

Plaintiff also states that she would not recognize the risk that the placement of Zonar's handheld was not safe. Further, she points out that Zonar checked every bus at PVSD after its system was installed, and that Zonar trainers traveled to PVSD and trained individuals at the site who then trained the bus drivers on the use of the handheld. Plaintiff also indicates that Zonar made documents available for the bus drivers' training, including the Zonar 2010 "User Guide" and the "Quick User Guide".[4] Additionally, the

---

[4]The "Zonar 2010" is the model number for the actual handheld device that the drivers use to perform their inspections.

evidence shows that Zonar trained Velociti technicians on the installation process of the GPS units.

However, fatal to plaintiff's strict liability failure to warn claim is the fact that the Zonar handheld in the Vehicle Mount located in the bulkhead over the stairwell of bus number 42 was installed in or about November of 2008. Plaintiff was employed as a bus driver by PVSD and then by First Student for "ten-plus years" at the time of the August 2010 accident. In fact, plaintiff was in the top ten on the seniority list for drivers in the PVSD in 2010. (Doc. 40-1, at 59-60). Further, bus number 42 was assigned to Mrs. Dorshimer. (Doc. 35-2, at 5, Doc. 40-1). During the time from November 2008 until her August 30, 2010 fall, there is sufficient evidence that Mrs. Dorshimer was well aware of the location of the Zonar handheld unit in bus number 42 since she was required to use and replace this device in the Vehicle Mount four times daily, twice for pre-trip inspections and twice for post-trip inspections. Additionally, as Zonar states, (Doc. 41, at 6), "[a] warning to Plaintiff that the product might pose a danger if it was installed out of reach over an open set of steps would be meaningless and superfluous as the condition was obvious to any user." Simply put, there was not a nonobvious danger inherent in the use of the Zonar product.

Placement of the Vehicle Mount over the windshield in the extreme upper corner on the passenger side of the bus, over an open set of steps, is so obviously unsuitable for use that no warning against it was required. (See

Doc. 34-9 photos). There is nothing latent or unobvious about the danger posed or the way to avoid it. Additionally, Zonar provided installation instructions regarding product placement with its device, including the instruction not place any component of the product, in particular the Vehicle Mount, in an area which is difficult to access. Zonar's manual also provided that the Vehicle Mount should not be placed near dirty, dusty or damp areas, such as near entranceways. Both First Student and Velociti were well aware of these instructions. It is clear that a better warning would not have prevented plaintiff's accident. In fact, Schwartz does not opine that the instructions provided in Zonar's installation manual were inadequate and, he does not conclude any additional warnings should have accompanied the product or that different installation instructions would have prevented plaintiff's accident.

Further DeNardo testified that since 2008 when First Student took over the buses at PVSD, she was required to have five safety meetings with the bus drivers per school year. DeNardo also stated that after the Zonar equipment was installed on the buses, none of the drivers at any of the safety meetings ever expressed any concerns about the location of the handheld units in any of the buses. Moreover, none of the drivers ever came to her at those meetings or privately or through one of her assistants and expressed any concerns about nearly falling out of buses because of the Zonar units. Neither DeNardo nor her staff requested the relocation of any of the Zonar

31

handheld units in any of the buses since they were installed in 2008 and, she was not aware of any incident of a driver falling out of a bus because of the units. In fact, DeNardo stated that on the day of her fall, plaintiff told her that "I fell coming down the steps" and not that she fell trying to get the handheld unit from the mount or to put it back into the mount. (Doc. 40-1, at 48-54).

"To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." Pavlik, 135 F.3d at 881 (citing Conti, 743 F.2d at 197). "[T]he plaintiff enjoys the benefit of a rebuttable presumption that an adequate warning would have been heeded if it had been provided; however, one way the defendant can rebut this presumption is by demonstrating that the plaintiff was previously fully aware of the risk of bodily injury posed by the product." Id. However, to prevail on summary judgment, the record must show that a reasonable fact finder would be bound to find that plaintiff was fully aware of the obvious risk of bodily injury on August 30, 2010, when she reached to use the handheld in the Vehicle Mount in bus number 42. Id. at 884.

As discussed, the installed location of the Zonar Vehicle Mount in bus number 42 was open and obvious and in violation of Zonar's installation instructions. Additionally, the court finds that the evidence demonstrates such a prior awareness by plaintiff as to the clearly precarious location of the Vehicle Mount and the handheld in bus number 42 existed in this case. The

court also finds that there is insufficient evidence in the record to support a reasonable inference that a more adequate or alternative warning on the Zonar product after the plaintiff had used it since its installation in 2008 might have prevented her fall. As such, plaintiff would have been fully aware of where the Vehicle Mount was located in her bus for almost two years.

Based on the above stated facts, plaintiff was already aware of the obvious dangers associated with the location of the handheld in bus number 42 when she allegedly reached for it on August 30, 2010,  the day of her fall. *See Conti, supra* (evidence in the record showed that the victim's husband was already aware of the complained of danger before the time of the injury and Third Circuit found that the allegedly defective lack of an adequate warning could not have proximately caused the victim's injuries); *see also* Overpeck v. Chicago Pneumatic Tool Co., 634 F.Supp. 638 (E.D.Pa. 1986), aff'd, 823 F.2d 751 (3d Cir. 1987) (Plaintiff was injured when a tire mounting tool manufactured by defendant disengaged from a tire and he was struck in the eye and, he alleged that the manufacturer had failed to adequately warn him of this danger. The court found that any additional warning would not have provided plaintiff with any new information since he testified that he was aware that the mounting tool might fly off during operation).

Thus, Zonar's motion for summary judgment with respect to plaintiff's strict liability failure to warn claim is **GRANTED**. Since Zonar's motion is granted as to both theories of plaintiff's strict liability claim, judgment

regarding this claim contained in Count I of her complaint will be entered in favor of Zonar.

### 2. Negligence Claim

Pennsylvania law imposes negligence liability as well as strict liability upon product manufacturers. Tincher, 104 A.3d at 376, 383–84. The duty in a strict liability cause of action is distinct from the duty owed in a negligence action. Tincher, 104 A.3d at 400. The standard for establishing a strict liability claim in Pennsylvania is more easily satisfied than that for a negligence claim. Tincher, 104 A.3d at 364, 401.

In order to establish a negligence claim under Pennsylvania law, a plaintiff must prove each of the following four elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005). A plaintiff must show that the defendant's negligence was the proximate cause of his or her injury, that is, causation which was a factual cause in bringing about the alleged injury. Gorman v. Costello, 929 A.2d 1208, 1213 (Pa.Super.Ct. 2007).

Plaintiff argues that she has produced sufficient evidence for her negligence claim, Count II, to proceed. The court concurs and finds that there are too many facts in dispute precluding summary judgment with respect to

34

plaintiff's negligence claim. It is undisputed that Zonar was not a party to the 2008 contract between Velociti and First Student. However, there is evidence that Zonar undertook a duty to train the Velociti technicians as to the proper installation of its systems, but it is disputed as to whether Zonar failed to properly do so regarding the placement of the Vehicle Mount with the handheld in bus number 42. According to Judd, he was trained by Zonar on both the type of bus and the location of the handheld to be placed in the bus. In fact, Judd stated that he was given specific direction by Zonar and First Student regarding where to place the handheld unit during his training. He also stated that during the PVSD project, he was instructed to place the handheld units anywhere there was available space on the bulkhead of the buses. (Doc. 34-12, at 8-9). Further, Schwartz opines that Zonar was responsible for ensuring that its installation instructions and guidelines were followed by Velociti.

The evidence is also disputed whether Gabbard performed quality assurance inspections at PVSD while Judd was there after the Velociti technicians installed the Zonar Systems on First Student's buses. According to Judd, Gabbard said that he was at PVSD to make sure Judd was doing what he was supposed to be doing with respect to the Zonar systems. It is not clear if Gabbard was at PVSD when the Velociti technicians were there installing the systems and whether Gabbard inspected plaintiff's bus, number 42, while he was at PVSD. Thus, it is disputed whether Zonar had undertaken

35

the responsibility for performing safety inspections after the Zonar systems were installed on the buses at PVSD and whether First Student relied on Zonar to make these inspections. As plaintiff points out, the weight afforded to the testimony of Gabbard and Judd regarding whether quality assurance checks were performed by Zonar at PVSD is for the fact finder to determine.

It is also disputed whether the Velociti installers could move the signs, placards, first aid kits from the bulkhead area of the buses to install the Zonar systems if they were in the way and there was no safe access location. During the pilot training, Zonar and Velociti worked together to determine the safe placement of the Vehicle Mount for the handheld. (Doc. 34-1, at 14). It is not disputed that placement of the Vehicle Mount in the bulkhead over the stairwell of the bus was unsafe and contrary to Zonar's installation guidelines. It is disputed whether Zonar failed to appropriately train the Velociti installers so as to prohibit this unsafe placement and whether Zonar representatives saw where the Vehicle Mount was installed in plaintiff's bus. Plaintiff alleges that this failure by Zonar led to her fall on August 30, 2010. (Doc. 40, at 17).

Considering the facts in the light most favorable to the nonmoving plaintiff, Pignataro v. Port Auth. of N.Y and N.J., 593 F.3d 265, 268 (3d Cir. 2010), the court finds that Zonar has failed to show that plaintiff's negligence claim fails as a matter of law. Plaintiff has sufficiently "set forth specific facts showing that there is a genuine issue for trial" regarding her negligence claim. Anderson, 477 U.S. at 250, 106 S.Ct. 2505 (internal quotation marks omitted).

Thus, Zonar's motion for summary judgment with respect to plaintiff's negligence claim, Count II, is **DENIED**.

## V.    CONCLUSION

In light of the foregoing, Zonar's motion for summary judgment, (Doc. 33), is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** to Zonar on plaintiffs' strict liability claim for design defect and failure to warn, Count I. Summary judgment is **DENIED** on plaintiffs' claim for negligence, Count II. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 18, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-0553-01.wpd